**STUDENTS OF CALIFORNIA SCHOOL FOR THE BLIND, et al., Plaintiffs-Appellees,**

v.

**Bill HONIG, in his capacity as Superintendent of Public Instruction of the State of California, et al., Defendants-Appellants.**

No. 84–1506.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 16, 1984.

Decided June 29, 1984.

Dennis Eckhart, Deputy Atty. Gen., Sacramento, Cal., for defendants-appellants.

Armando M. Menocal, III, Public Advocates, Inc., San Francisco, Cal., for plaintiffs-appellees.

Before CHOY, PREGERSON, and REINHARDT, Circuit Judges.

PREGERSON, Circuit Judge.

This law suit concerns the seismic safety of the new Fremont campus of the California School for the Blind. The testimony of a court-appointed expert convinced the district court that additional tests were needed to determine the seismic safety of the Fremont school. The court entered a preliminary injunction ordering the state defendants to perform the additional tests or to close the school. We affirm.

I. *Statement of Facts*

This litigation arose when the California Department of Education decided to move its residential school for the blind from Berkeley to Fremont. The students sought to block the move. In June 1980, they brought suit in federal court against California educational authorities under the Education for All Handicapped Children Act of 1975 (codified at 20 U.S.C. §§ 1232, 1401, 1405, 1406, 1411–1420 and 1453 (1983)), § 504 of the Rehabilitation Act of 1973 (codified at 29 U.S.C. § 794 (1982)), and 42 U.S.C. § 1983. The students challenged the move on a procedural ground, alleging that the state defendants failed to give proper notice of a change in the students'

educational placement. The students also challenged the move on the substantive grounds that the facilities and community in Fremont were inappropriate for education of the blind. Among the many reasons against the move set out in the complaint were allegations that the Fremont site was an earthquake-prone, dangerous area.

In August 1980, the district court certified a plaintiff class of all present and future students at the school and their parents and guardians. The district court temporarily enjoined the move to Fremont pending formal notice to each parent or guardian and a hearing for those requesting it. Some parents objected to the possibility that no special school for the blind would be available if the Fremont move was blocked. The district court later modified its order and allowed the school to open.

The seismic safety claims became a major focus of the law suit at the pretrial stage. In the pretrial order, the students claimed for the first time that the state defendants had violated California Education Code provisions relating to the seismic safety of school sites. The students urged the court to exercise pendent jurisdiction over state law seismic safety claims. The state defendants argued that pendent jurisdiction was inappropriate because the seismic claims had no common nucleus of operative fact with the educational challenges to relocating the school. The district court did not decide to entertain the seismic safety claims until the trial was underway. When the court announced its decision to hear the claims, it failed to specify whether it would consider the claims under federal question jurisdiction or as pendent state law claims.

The trial began on March 31, 1981 and consumed 48 court days. Many experts testified on the seismic safety issues, and their testimony was highly contradictory. On January 19, 1982 the court orally announced a decision. The court found in favor of the state defendants on the claims relating to the quality of education at the new Fremont campus. The court also found that it was unable to decide the seismic safety claims on the basis of evidence presented at trial. The court then sua sponte reopened the case and stated its intention to appoint a neutral expert to determine whether the state defendants had adequately tested the Fremont campus for seismic safety. The court ultimately selected Dr. Richard Jahns, former Dean of Stanford University's Earth Sciences Department, to serve as the neutral expert.

The state defendants objected to the reopening procedure, to the court's choice of expert, and to the way the court instructed the expert. The state defendants refused to post its half of the expert's fee, which caused the district court to enter a preliminary injunction preventing the state defendants from using the Fremont campus until the money was posted. The state defendants appealed to this court, and asked for a stay of the injunction pending appeal. This court denied the stay, and the state defendants withdrew the appeal and posted the money.

When his study was completed, Dr. Jahns testified that the seismic studies of the site were inadequate because they did not provide enough information to evaluate the school's physical safety. The state defendants then made an offer of proof to rebut Dr. Jahns' testimony, but the district court rejected the offer as untimely. The court entered findings of fact and conclusions of law which found that California's pre-construction seismic safety investigation was inadequate. The court then issued a preliminary injunction ordering the state defendants to conduct additional geological tests (under the supervision of Dr. Jahns as special master) or to close the Fremont campus. The tests will cost about $200,000.

The state defendants brought this appeal under 28 U.S.C. § 1292(a)(1) (1982). They applied to this court for a stay of the district court's order pending appeal, which we denied. The Supreme Court also refused to stay the district court's order requesting additional geological tests. The parties

joined in a motion to expedite the appeal, which we granted.

On this appeal, the state defendants argue that:

(1) the preliminary injunction violates the Eleventh Amendment;

(2) the students' seismic safety claims are not cognizable under federal law;

(3) the district court's finding that seismic testing of the Fremont site was inadequate is clearly erroneous; and

(4) the district court abused its discretion in reopening the case, appointing a neutral expert, and rejecting the state defendants' offer of proof in rebuttal.

## II. *Standard of Review*

■ Our standard of review depends on whether the district court's order should be characterized as a preliminary or as a permanent injunction. The court styled its order as a preliminary injunction, an intermediate step to an ultimate determination whether the Fremont campus is either seismically safe or unsafe. The state defendants argue that the district court's injunction is an interlocutory, but permanent, injunction that requires a more exacting review than that accorded a preliminary injunction. *See, e.g., Smith v. Vulcan Iron Works*, 165 U.S. 518, 17 S.Ct. 407, 41 L.Ed. 810 (1897).

In *Smith*, the trial court had made a final determination on the merits in awarding injunctive relief, and all that remained for the court to do was to calculate damages. This case is distinguishable. The essence of the district court's order is preliminary, not final. The order prevents the state defendants from using the Fremont campus unless certain geological tests are performed. The tests will determine once and for all whether the campus is seismically safe. The liability of the state defendants will not be finally decided unless and until the tests are performed.

■ Because we conclude that the order on appeal is a preliminary injunction, our review is necessarily abbreviated. "A court of appeals, like a district court, is not required to resolve doubtful or difficult questions of law at this preliminary stage." *Lopez v. Heckler*, 725 F.2d 1489, 1498 (9th Cir.1984), *partial stay granted, Heckler v. Lopez*, —— U.S. ——, 104 S.Ct. 2164, 80 L.Ed.2d 548 (1984). We will reverse the district court only if we find that it abused its discretion in granting the preliminary injunction. Abuse of discretion is shown if "the district court's decision was based on an error of law or on a clearly erroneous finding of fact." *Lopez v. Heckler*, 725 F.2d at 1497 (citations omitted).

## III. *The Standard for Granting a Preliminary Injunction*

■ We note as a threshold matter that the district court applied the proper legal standard for granting a preliminary injunction. In its Memorandum of Decision filed August 17, 1982, the district court found that the appellants' contentions raised serious questions regarding the seismic safety of the Fremont facility and that the dangers to the students if they remained at the facility decidedly outweighed the hardships the state defendants would sustain if additional seismic tests were ordered. In this circuit, a preliminary injunction is properly granted if the moving party has demonstrated "*either* a combination of probable success on the merits and a possibility of irreparable injury, or that serious questions are raised and the balance of hardships tips sharply in the moving party's favor." *Beltran v. Myers*, 677 F.2d 1317, 1320 (9th Cir.1982) (emphasis in original). The "balance of hardships" is a critical element in justifying a preliminary injunction, and the public interest is also an important factor strongly to be considered. *See Lopez v. Heckler*, 725 F.2d at 1498 (citing extensive authority).

In the instant case, the state defendants do not argue that the balance of hardships fails to tip sharply in favor of the appellants or that the preliminary injunction is not in the public interest. The tests ordered by the district court will cost the state approximately $200,000. Weighed against that relatively small sum is poten-

tially the safety of blind and multi-handicapped students. We agree with the district court that under the circumstances the balance of hardships tips sharply in favor of the handicapped students.

The state defendants' arguments in opposition to the preliminary injunction are directed to the legal and factual merits of the case. Our task is, therefore, to review the district court's conclusion that the students demonstrated probable success on the merits or, in the alternative formulation, that the students raised serious legal questions. *Beltran,* 677 F.2d at 1320.

## IV. *The Eleventh Amendment Question*

The state defendants argue that the preliminary injunction is barred by the Eleventh Amendment. The state defendants rely on *Pennhurst State School and Hospital v. Halderman,* —— U.S. ——, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984) (*Pennhurst II*), a recent Supreme Court decision holding that the Eleventh Amendment bars injunctions ordering state officials to conform their conduct to state law. In *Pennhurst II,* the Supreme Court said, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id.*

*Pennhurst II,* however, is inapplicable here. The district court did not order the state defendants to conform their conduct to state law, but to abide by federal statutes,[1] which incorporate certain aspects of state law.

■ The Supreme Court's actual disposition of the *Pennhurst II* case proves its inapplicability to the instant case. The

Court reversed the Third Circuit's decision only inasmuch as it upheld the injunction on the basis of state law. The Court remanded the case to the Third Circuit for a determination whether the injunction could be sustained under the Eighth and Fourteenth Amendments as well as under one of the federal statutes at issue in this case, § 504 of the Rehabilitation Act of 1973. The framing of the remand indicates that the Supreme Court believed the Eleventh Amendment was a bar only to an injunction based on state law. Here we must determine whether the preliminary injunction can be sustained not on the basis of state law, but under § 504 of the Rehabilitation Act or under the Education for All Handicapped Children's Act (EAHCA). Under both federal statutes, California waived its Eleventh Amendment immunity by participating in federally funded and regulated programs.

This court has previously decided that a state waives its Eleventh Amendment immunity under EAHCA by participating in a federally funded and regulated program to provide special educational programs for handicapped children. *Dept. of Education, State of Hawaii v. Katherine D.,* 727 F.2d 809, 818–19 (9th Cir.1983).[2] In *Katherine D.,* we noted that the Supreme Court has said that it

> will find waiver only where stated by "the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.

*Katherine D.,* 727 F.2d at 819 (quoting *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974)). We then indicated that Eleventh Amendment immunity will be waived in connection with particular legislation when (1) Con-

---

**1.** Early in the case, the district court stated that it was entertaining the seismic safety claims on the basis of pendent jurisdiction. Later, the court said that it had both federal question and pendent jurisdiction. In its latest statement, the district court found that any relief under state law would be the same as under federal law, and based its holding on federal law alone. The state defendants agree that "in the final analy-

sis" the district court was not relying on pendent jurisdiction, but was entertaining the seismic safety claims as arising under two federal statutes.

**2.** A petition for rehearing and suggestion for rehearing en banc are pending, but involve issues not relevant to this case.

gress has authorized suit against a class of defendants that include states, and (2) the state enters into an activity regulated by federal statute. *Katherine D.*, 727 F.2d at 819 (quoting *Mills Music, Inc. v. Arizona*, 591 F.2d 1278, 1283 (9th Cir.1979)). Applying the *Mills Music* test, we found first that in enacting EAHCA, Congress authorized suits against a class of defendants that include states—private actions under EAHCA are inevitably against state agencies. We also held that the second prong of the test was satisfied; by receiving funds under EAHCA, a state voluntarily enters into an activity regulated by federal law.

This court also recently held that states' Eleventh Amendment immunity is waived under § 504 of the Rehabilitation Act, *Scanlon v. Atascadero State Hospital*, 735 F.2d 359 (1984). Section 504 provides that no otherwise qualified handicapped individual shall be subject to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794 (1982). In *Scanlon*, we held that § 504 is an enactment pursuant to section 5 of the Fourteenth Amendment which " 'by its terms authorized suit by designated plaintiffs against a general class of defendants which literally included States or state instrumentalities,' and the 'State by its participation in the program authorized by Congress had in effect consented to the abrogation of that immunity.' " *Scanlon*, at 361.

■ Applying the *Mills Music* two-pronged test to evaluate § 504, once again we see that (1) Congress has authorized private suits against a class of defendants that inevitably includes states, and (2) by accepting federal funds, the states have entered into activities regulated by federal law. Thus, the Eleventh Amendment is not a barrier to suits against states under either § 504 or EAHCA.

## V. *Cognizability of Seismic Safety Claims Under Federal Law*

We must now determine whether the seismic safety claims are cognizable under federal law. The students base their claims on two federal statutes: EAHCA, which provides funds to states for the education of handicapped children with certain conditions attached, and § 504, which bars discrimination against the handicapped in federally-funded programs. These federal statutes urged by the students as a basis of jurisdiction make no specific mention of seismic safety. Our subject matter jurisdiction hinges on whether these statutes can be interpreted to regulate seismic safety of schools for the handicapped either directly or by the adoption of state law. In the discussion that follows, we analyze each statute in turn.

### A. *The Education of All Handicapped Children Act of 1975*

■ EAHCA provides federal funds to assist state agencies in educating handicapped children. EAHCA conditions funding on the state's compliance with a variety of regulations and procedures. The state may qualify for federal assistance only if it "has in effect a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). The term "free appropriate public education" is defined in 20 U.S.C. § 1401(18).

The term "free appropriate public education" means special education and related services which (A) have been provided at public expense, under the public supervision and direction, and without charge, (B) *meet the standards of the State Educational Agency*, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

(Emphasis added.)

The definition of "free appropriate public education" says nothing about the seismic safety of physical structures; the emphasis is on services. "Free appropriate public education" means special education and related services...." 20 U.S.C. § 1401(18).

"Special education" means "specially designed instruction ... to meet the unique needs of a handicapped child ...." 20 U.S.C. § 1401(16). "Related services" refers to transportation, speech, physical and occupational therapy, recreation, transportation, and medical and counseling services. 20 U.S.C. § 1401(17). Thus, there is no explicit coverage of the students' plaintiffs' seismic safety claims in EAHCA.

We find, however, that the statutory definition of "free appropriate public education" supports the students' position. 20 U.S.C. § 1401(18)(B) provides that a free appropriate public education is one that "meet[s] the standards of the State educational agency." EAHCA thus incorporates state educational standards. The students correctly point out that EAHCA does not specifically provide for textbooks, writing materials or appropriately trained teachers, but EAHCA incorporates the state standards that provides those items. We note that California law requires seismic safety of schools. *See* Cal.Educ.Code §§ 39002, 39002.5 (West 1978 and Supp.1984). In light of specific provisions for seismic safety in the California Education Code, there is a strong argument that a seismically unsafe school would not meet the standards of the state educational agency, and thus, would not be part of an appropriate public education under EAHCA.

The state defendants argue first that seismic safety is not a "standard of the state educational agency" within the meaning of 20 U.S.C. § 1401(18)(B), but rather relates to non-educational standards imposed by the "office of the state architect." This argument is not persuasive in light of the fact that there are seismic safety standards relating directly to schools that are codified as part of the California Education Code.

The state defendants' second argument is based on a footnote in the only Supreme Court case construing EAHCA, *Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). In the footnote, Justice Rehnquist observes that the legitimacy of Congress' authority under the spending power to legislate vis-a-vis the states rests on whether a state knowingly and voluntarily accepts conditions set forth in the federal statute. "Accordingly if Congress intends to impose a condition on a grant of federal monies, it must do so unambiguously." *Id.* at 204 n. 26, 102 S.Ct. at 3049 n. 26 (quoting *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981) (*Pennhurst I*)). The state defendants argue that regulation of seismic safety is not clear or unambiguous under EAHCA. It is clear, however, that EAHCA "both funds and regulates states' assistance to handicapped students." *Department of Education, State of Hawaii v. Katherine D.*, 727 F.2d 809, 813 (1983) (citations omitted) (emphasis added). While the statute does not unambiguously place conditions relating to seismic safety of schools on states accepting funds, it expressly provides that an appropriate education meets the standards of the State educational agency. California knew when it accepted federal monies for programs funded under EAHCA that it would have to meet the standards established by its educational agency, and that those standards encompassed seismic safety of school sites.

This court has previously found that physical safety is part of an appropriate education under EAHCA. *See Mountain View-Los Altos Union High School District v. Sharron B.H.*, 709 F.2d 28, 30 (9th Cir.1983) (holding that parent cannot unilaterally transfer child to private school and seek reimbursement of tuition under EAHCA except where transfer is justified by a threat to child's physical health); *Dept. of Education, State of Hawaii v. Katherine D.*, 727 F.2d at 821 (educational plan involving risk to child's life cannot be considered appropriate education under EAHCA) (Reinhardt, J., dissenting in part). *See also Anderson v. Thompson*, 658 F.2d 1205, 1213–14 (7th Cir.1981) (Congress could not have intended a child to remain in an educational placement where there is a serious risk of injury to the child's physical health). Although these cases are not directly on point because they involve reimbursement

for safer alternatives to placement in public schools, they illustrate that physical safety, not surprisingly, is considered an element of an appropriate education.

In short, although EAHCA does not expressly provide for seismic safety, there is a strong argument that it incorporates state law seismic safety standards. Moreover, physical safety is considered part of the appropriate public education guaranteed by EAHCA. Thus, while we need not finally decide this jurisdictional issue, *Lopez v. Heckler*, 725 F.2d at 1498–99, we find that the students have raised serious legal questions and are likely to succeed on the merits.

### B. *Section 504*

The district court also based subject matter jurisdiction on § 504 of the Rehabilitation Act of 1973, which provides:

> No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794 (1982).

The state defendants argue that the main thrust of § 504 is to provide equal access to state rehabilitation and employment programs receiving federal funds, not to provide any substantive safety standards. As the students point out, however, § 504 not only guarantees participation and access to programs, but also prohibits discrimination under any program receiving federal financial assistance. Here, they argue, the state school for the blind is less safe than other schools, and thus, California discriminates against the handicapped in a fashion prohibited by § 504.

A regulation promulgated by the Department of Health and Human Services pursuant to § 504 entitled "Educational Setting" is directly on point. The regulation specifically provides that facilities for the handicapped shall be comparable to other facilities.

> *Comparable facilities.* If a recipient, in compliance with paragraph (a) of this section operates a facility that is identifiable as being for handicapped persons, the recipient shall ensure that the facility and the services and activities provided therein are comparable to the other facilities, services, and activities of the recipient.

45 C.F.R. § 84.34(c).

The state defendants argue that 45 C.F.R. § 84.34(c) is invalid because it exceeds the scope of statutory authority. We disagree, and find that § 84.34(c) is a valid interpretation of § 504. The interpretation of a statute by the administrative agency charged with its construction is entitled to great deference. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Where an agency is entrusted with the primary task of defining statutory language, a review of the validity of a regulation promulgated under the statute is limited to determining whether the regulation is reasonably related to the purposes of the enabling legislation. *Mourning v. Family Publications Service Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973). Because § 504 forbids discrimination in federally funded programs, a regulation requiring comparable facilities seems to be a logical and valid interpretation of that statute.

The state defendants also argue that the students' interpretation of § 504 requires affirmative action which would be contrary to the scope of § 504 as construed in *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). This argument misses the mark. The students' contention is that the Fremont campus was not as adequately tested as other school facilities in California, not that any affirmative action is required. Second, *Davis* did not hold that states are not required to make reasonable accommodations to avoid discrimination against the handicapped. The court said:

> If these regulations were to require substantial adjustments in existing pro-

grams *beyond those necessary to elimi-nate discrimination against otherwise qualified individuals* ... they would constitute an unauthorized extension of the obligations imposed by that statute. *Id.* at 410, 99 S.Ct. at 2369 (emphasis added). We believe this language at a minimum means states must make reasonable accommodations to avoid discrimination against handicapped individuals. In the context of this case, the state is required to make the school for the blind as safe as other schools. In addition, we believe that the state is also required to make such reasonable adjustments as are necessary to make a school for blind and multi-handicapped students as safe as other California schools are for their nonhandicapped students. Such adjustments are "necessary to eliminate discrimination against otherwise qualified individuals." The students produced expert witnesses who testified that seismic problems with the Fremont site would pose a serious hazard in a normal school but a "super serious" hazard to a school of multi-handicapped children.

■ Finally, the state defendants argue that the general anti-discrimination provisions of § 504 cannot be used to make an end run around the more specific provisions of EAHCA, citing *Dept. of Education, State of Hawaii v. Katherine D.*, 727 F.2d 809, 820–21 (9th Cir.1983) (holding that comprehensive remedial provisions of EAHCA prevented handicapped students from recovering attorneys' fees under the Rehabilitation Act, 29 U.S.C. § 794a(b)).

*Katherine D.* involved a claim addressed squarely and in detail by EAHCA. We held that the plaintiff's claim was therefore not cognizable under the Rehabilitation Act. In the instant case, § 504, and particularly the regulation set out at 45 C.F.R. § 84.34(c), seem to be at least as directly related to the issues involved as anything in EAHCA. While EAHCA is more specific than the Rehabilitation Act as to educational programs, the Rehabilitation Act is more specific as to physical facilities. Thus, although we have concluded that plaintiffs present serious legal questions regarding whether EAHCA provides them a remedy, we also think that they have presented a serious question as to the availability of relief under the Rehabilitation Act.

## VI. *The District Court's finding of Inadequate Seismic Testing is Not Clearly Erroneous*

■ We noted earlier that we will reverse a district court's decision regarding a preliminary injunction if the decision was based on "clearly erroneous findings of fact." *Lopez v. Heckler*, 725 F.2d at 1497 (citations omitted). The district court found that seismic testing at the Fremont site was inadequate. That finding is not clearly erroneous.

A witness for the state defendants, Donald Jephcott, testified that his independent review of pre- and post-acquisition geotechnical and soil studies led him to conclude that the reports were adequate to meet state law requirements. The several experts that testified on behalf of the students (and a court-appointed neutral expert) contradicted Jephcott, testifying that seismic testing was inadequate.

The evidence at trial showed that a total of three seismic studies of the site were done. The first test was done by the California Department of Mining and Geology. That study included no physical examination of the site. It was based on historical evidence about earthquakes and studies done on nearby construction sites. The students' experts testified that this study was a mere review of the literature.

The second study was done by Woodward-Lundgren & Associates. That test did involve some borings and test pits, but the students presented evidence that the borings and pits were not adequate to make a study of the 90-acre site. The students also presented evidence that the Woodward-Lundgren study was preliminary in nature, and in fact recommended additional studies to determine liquefaction

potential.[3] Plaintiffs' experts also testified that the study understated the potential for liquefaction.

The third study was performed by Caltrans. The Caltrans study included quite a few borings, but the students' experts testified that for the most part these borings were too shallow. The Caltrans study followed up on the possibility of a fault[4] on the site, originally suggested in the Department of Mining and Geology study. Three out of four fault testing techniques used by Caltrans suggested the presence of a fault. On the basis of these results, Caltrans recommended further tests, including trenching, yet trenching was never done.

In short, the students' experts testified, and the court-appointed neutral expert concurred, that the three seismic investigations performed, taken together or separately, were inadequate to determine seismic hazards at the Fremont site. The court-appointed expert recommended trenching to determine both the possibility of surface faulting and ground rupture due to liquefaction. The state's own study by Caltrans recommended the same program. Dr. Jahns, the court-appointed expert, also recommended "many more moderately deep exploratory borings than have been developed to date." Such exploratory borings would indicate the presence of masses of sand and fine gravel with the potential for liquefaction during an earthquake.

In view of the fact that two of the three seismic studies were clearly preliminary in nature, and the fact that the third study made recommendations for further testing that were never accomplished, we conclude that the district court's findings of fact that the seismic tests were inadequate are not clearly erroneous.

## VII. The District Court's Use of a Court-Appointed Expert

After a lengthy trial and much conflicting expert testimony, the judge could not decide the merits of the students' seismic safety claims on the basis of evidence presented at trial, so he reopened the case and appointed a neutral expert to evaluate the adequacy of seismic testing at the Fremont site. The state defendants have several objections to this procedure on this appeal, all of which we find unpersuasive.

### A. Reopening the Case

The state defendants object to the district court's sua sponte reopening the case to obtain evidence from a neutral expert. Sua sponte reopening is an unusual procedure, but it is within the discretion of the trial court. See Calage v. University of Tennessee, 544 F.2d 297, 302 (6th Cir. 1976) (district court did not abuse its discretion in sua sponte reopening sex discrimination case for additional evidence to explain wage differentials); Arthur Murray, Inc. v. Oliver, 364 F.2d 28, 34 (8th Cir.1966) (district court abused discretion in sua sponte reopening antitrust case for additional evidence on lost profits where there was sufficient evidence in the record and no exceptional circumstances).

The court's discretion was not abused here. Both Calage and Arthur Murray emphasize that "such evidence as a judge may properly seek to have added to a record on his own motion should appear both to be important as a matter of preventing injustice and to be reasonably available." Calage, 544 F.2d at 302 (citing Arthur Murray, 364 F.2d at 34). The district court specifically found reopening was

---

3. Liquefaction occurs when shaking by an earthquake causes masses of fine subsurface sand and gravel to lose strength and cohesiveness. As a result, the subsurface loses its capability to bear the weight of the surface, and the surface settles. Depending upon the magnitude of settlement, buildings can crack and tilt and gas and water lines can rupture.

4. A fault is a fracture in the earth's crust which, during an earthquake, can shift either horizontally or vertically. California law prohibits locating a school on the trace of an active fault. Cal.Educ.Code § 39002.5 (West 1978 Supp. 1984). The Fremont campus is located one-half mile from a major fault called the Hayward Fault. Moreover, a masters thesis done at Berkeley in 1938 projected a fault trace running right through the Fremont school site.

necessary to prevent injustice and that the evidence was reasonably available. Only one additional expert testified, and his testimony was based primarily on the existing trial record. Although the procedure is somewhat unusual, the circumstances of the case appear to justify it.

### B. *Rule 706*

 The district court expressly relied on Rule 706, Fed.R.Evid. as a source of power to appoint a neutral expert. Rule 706 allows the court to appoint a neutral expert on its own motion, whether or not the expert is agreed upon by the parties. Rule 706 also allows the court to assess the cost of the expert's compensation as it deems appropriate. Appointments under Rule 706 are reviewable only for abuse of discretion. *See Fugitt v. Jones,* 549 F.2d 1001, 1006 (5th Cir.1977). As required by Rule 706, the judge allowed both parties to thoroughly cross-examine its appointed expert. Thus, under Rule 706, the district court's appointment of a neutral expert was proper.

The state defendants argue that the district court treated the neutral expert, Dr. Jahns, not as a neutral expert, but as a special master. Appointments of special masters are subject to stricter standards of review than appointments of neutral experts under Rule 706. Rule 53, Fed.R. Civ.P. governs the appointment of special masters. Rule 53(b) provides, "A reference to a master shall be the exception and not the rule." The court in *Arthur Murray, supra,* used the lack of an "exceptional condition" as grounds for reversing the appointment of a special master in an antitrust case.

Here, the district court first appointed Dr. Jahns expressly as a court-appointed neutral expert under Rule 706. He was not appointed a special master until later. After his testimony convinced the court to order additional testing, Dr. Jahns was appointed special master to oversee the court-ordered tests. The state defendants argue, however, that his role was akin to that of a special master throughout the proceeding,

because the district court relied upon him so heavily. The argument is not persuasive. Even if Jahns is characterized as a special master from the time of his original appointment, the case is complex enough to fit the exceptional circumstances requirement of Rule 53(b).

### C. *Dr. Jahns's Qualifications*

The state defendants contend that Dr. Jahns was unqualified. They argue that Jahns was not experienced in investigating school sites, that he was not familiar with California law regulating the construction of schools in seismically dangerous areas, and that he was not an expert on the effects of liquefaction, a potential seismic problem at the Fremont site. The students argue that Dr. Jahns was well-qualified, pointing out that Jahns was formerly dean of Stanford's Earth Sciences Department, and had extensive experience doing seismic safety evaluations for such critical facilities as nuclear power plants and hydroelectric dams. They also point out that Jahns was somewhat familiar with school sites, having reviewed at least ten school site investigations within the past five years, and that he generally understood seismic safety standards applicable to school sites under California law.

 We find the attack on Jahns' qualifications without merit. Under Rule 706, the court is free to appoint an expert of its own choosing without the consent of either party. Moreover, the question of whether an expert is qualified rests within the sound discretion of the trial judge. J. Weinstein & M. Berger, 3 *Weinstein's Evidence* ¶ 702[04] at 702–22 (1982). Nothing indicates that the trial court abused its discretion in selecting the qualified expert here.

### D. *Rejection of State's Rebuttal Evidence*

 The state defendants desired to make an offer of proof in rebuttal to Dr. Jahns's testimony. The district court refused to consider the offer of proof because it was untimely. The state defend-

ants were originally ordered to submit their offer of proof by September 26. Later, the court gave the state defendants an extension stretching until 15 days after Dr. Jahns testified. At the end of the 15-day period, the state defendants requested an additional four-week extension which was refused. Decisions relating to additional time for presenting evidence are within the sound discretion of the trial court. *Gilbert v. Lachapelle*, 127 F.2d 750, 751 (D.C.Cir. 1942).

Moreover, although the state defendants characterize the proferred testimony as "previously unavailable comparative analysis of liquefaction phenomena," the proferred testimony was from an expert who had already testified at trial and may have been somewhat cumulative. In sum, the district court did not abuse its discretion in rejecting the state defendants' offer of proof.

### VIII. *Conclusion*

Having reviewed all the contentions presented by the state defendants, we conclude that the students have shown probable success on the merits. In addition, the balance of hardships tips sharply in their favor. We therefore affirm the district court's preliminary injunction.

We accepted this appeal on an expedited basis. We understand that the geological tests must be performed as soon as possible before the rainy season begins. In light of this urgency, no petition for rehearing will be entertained. The mandate will issue immediately.

AFFIRMED.